IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GREGORY GOODWIN,               )
                               )
          Plaintiff,           )        Civil Action No. 05-CV-161 (Erie)
                               )
     v.                        )        Judge Maurice B. Cohill, Jr.
                               )
ACCURIDE ERIE, L.P.,           )        ELECTRONIC FILING
                               )
          Defendant.           )

## DEFENDANT'S CONCISE STATEMENT OF MATERIAL FACTS SUPPORTING MOTION FOR SUMMARY JUDGMENT

NOW COMES Defendant Accuride Erie, L.P. ("Accuride"), by and through its counsel, pursuant to Local Rule 56.1, and submits the following Concise Statement of Material Facts Supporting Motion for Summary Judgment.

### Defendant Accuride Erie, L.P.

1.    Accuride manufactures wheels for the automobile and trucking industries. (Complaint ¶ 8; Answer to Complaint ["Answer"] ¶ 8).

2.    Michael A. Pinson ("Pinson") has been the Human Resources Manager at the Accuride plant in Erie, Pennsylvania since February 2002. (Complaint ¶ 12; Answer ¶ 12; Pinson Dec. ¶ 2[1]).

3.    Accuride has an Equal Employment Opportunity Prohibition of Discrimination and Harassment policy that is posted in the Accuride plant. (Pinson Dec. ¶ 3; Pinson Dec. Ex. 1).

---

[1]    "(Pinson Dec. ¶ __)" and "(Pinson Dec. Ex. __)" refer to the Declaration of Michael Pinson and exhibits thereto contained in Defendant's Appendix of Exhibits at "A."

4.     The Equal Employment Opportunity Prohibition of Discrimination and

Harassment policy states:

> Accuride Corporation believes in and is firmly committed to a policy that assures equal employment opportunity to all employees.  All employment decisions are made solely on the basis of the qualifications of each individual.
>
> Accuride Corporation is also committed to providing its employees with a work environment that is safe and free of discrimination, including freedom from all forms of harassment based upon sex, race, color, religion, age, national origin, covered veteran status, disability, or other protected characteristic.  Such discrimination against, or harassment of, employees is prohibited and may result in disciplinary action up to and including termination of employment.
>
> No manager or supervisor shall threaten or suggest, either explicitly or implicitly, that an employee's submission to or rejection of sexual advances or requests for sexual favors will either enhance or adversely affect the employee's employment, evaluation, compensation, advancement, assigned duties, or any other terms or conditions of employment.
>
> Other actions occurring in the workplace, whether committed by managers, supervisors or non-supervisory personnel are also prohibited.  These include derogatory, degrading or demeaning words, gestures, actions or similar types of conduct concerning an employee's race, color, religion, age, sex, national origin, covered veteran status or disability.  Other prohibited actions include unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.  No manager or supervisor should request a loan from any subordinate or any favor of a significant value.
>
> Employees who believe they have been subjected to such discrimination or harassment should promptly report the conduct to their manager or supervisor.  If circumstances require that the employee discuss the conduct with someone else, the employee should seek the person assigned to investigate such matters or the Director/Compensation & Benefits.  A thorough investigation will be conducted.  Where the investigation confirms the allegations, prompt corrective action will be taken.  Regardless of the outcome of the investigation, the employee making the complaint will be informed of its results.  If the investigation indicates that there is no merit to the complaint or that no action is required, and if the

> employee requests in writing a review of the decision, the matter will be reviewed by the Sr. Vice President/Human Resources. No reprisal will be taken against complaining employees as a result of a complaint made responsibly and in good faith.

(Pinson Dec. ¶ 3; Pinson Dec. Ex. 1).

5.      Accuride's employment policies include a policy on Equal Employment Opportunity that states:

> It is the policy and practice of Accuride to afford equal opportunity in all our personnel practices to all employees and applicants for employment regardless of race, color, creed, religion, sex, age, national origin, disability, or any other protected status under applicable federal, state, local and other laws.

> The purpose of this policy is to avoid discrimination and extend equal employment opportunities to all applicants for employment and to all employees on the basis of individual merit and qualification.

(Pinson Dec. ¶ 4; Pinson Dec. Ex. 2).

6.      Accuride's employment policies include a Prohibition of Discrimination and Harassment that states:

> Accuride believes in and is firmly committed to a policy that assures equal employment opportunity to all employees. All employment decisions are made solely on the basis of the qualifications of each individual.

> Accuride is also committed to providing its employees with a work environment that is safe and free of discrimination, including freedom from all forms of harassment based upon sex, race, color, religion, age, national origin, covered veteran status, disability, or other protected characteristic. Such discrimination against, or harassment of, employees is prohibited and may result in disciplinary action up to and including termination of employment.

> No manager or supervisor shall threaten or suggest, either explicitly or implicitly, that an employee's submission to or rejection of sexual advances or requests for sexual favors will either enhance or adversely affect the employee's employment, evaluation, compensation, advancement, assigned duties, or any other terms or conditions of employment.

Other actions occurring in the workplace, whether committed by managers, supervisors or non-supervisory personnel, are also prohibited. These include derogatory, degrading or demeaning words, gestures, actions or similar types of conduct concerning an employee's race, color, religion, age, sex, national origin, covered veteran status or disability. Other prohibited actions include unwelcome sexual advances, request for sexual favors, and other verbal or physical conduct of a sexual nature. No manager or supervisor should request a loan from any subordinate or any favor of significant value.

Employees who believe they have been subjected to such discrimination or harassment should promptly report the conduct to their manager or supervisor. If circumstances make it desirable for the employee to discuss the conduct with someone else, the employee should seek the person assigned to investigate such matters or the Corporate Director/Compensation & Benefits. A thorough investigation will be conducted. Where the investigation confirms the allegations, prompt corrective action will be taken. Regardless of the outcome of the investigation, the employee making the complaint will be informed of its results. If the investigation indicates that there is no merit to the complaint or that no action is required, and if the employee requests in writing a review of the decision, the matter will be reviewed by the Senior Vice President/Human Resources. No reprisal will be taken against complaining employees as a result of a complaint made responsibly and in good faith.

(Pinson Dec. ¶ 5; Pinson Dec. Ex. 3).

7.    Accuride and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Local 1186 ("the Union") are parties to a collective bargaining agreement effective September 1, 2003 through August 31, 2007 ("Labor Agreement"). (Pinson Dec. ¶ 6; Pinson Dec. Ex. 4).

8.    Article 42 of the Labor Agreement provides as follows:

42.1    During this Agreement and any extension thereof, the Union will not authorize or knowingly permit employees to cause or take part in any strikes, work stoppages, slowdowns, or interruptions or cessations of work, and the Company will not lock out employees.

42.2    Any employees who engage in the actions prohibited by Article 42.1 are subject to discipline and discharge.

(Pinson Dec. Ex. 4).

9.    The Accuride plant in Erie, Pennsylvania published the "Erie Plant Rules of Conduct" ("Rules of Conduct") that all Accuride employees were required to follow.  (Pinson Dec. ¶ 7; Pinson Dec. Ex. 5).

10.    The Rules of Conduct provide in pertinent part:

In order for the Erie Plant to operate smoothly and efficiently, all employees are expected to observe essential common sense rules of conduct based on honesty and common decency.  Employees who violate these widely accepted industrial Rules of Conduct subject themselves to discipline, including discharge, depending on the circumstances.  Some of the actions that cannot be condoned and that may result in disciplinary action include the following:

. . .

11.  Inattention to work, negligence, or carelessness; any attempt to interrupt production or any aspect of the operations; or unsatisfactory and/or insufficient work.

. . .

These Rules of Conduct are effective January 27, 2003, and apply to all hourly employees.

(Pinson Dec. Ex. 5).

## Plaintiff's Employment At Accuride

11.    Plaintiff Gregory Goodwin ("Goodwin") became employed by Accuride at the Accuride plant in Erie, Pennsylvania on or about June 3, 2002.  (Complaint ¶ 7; Answer ¶ 7; Pinson Dec. ¶ 8).

12.    During his employment at Accuride, Goodwin was a Machine Line Operator.  (Complaint ¶ 7; Answer ¶ 7).

13.    During his employment with Accuride, Goodwin was a member of the Union and was subject to the terms of the Labor Agreement.  (Complaint ¶ 11; Answer ¶ 11; Pinson Dec. ¶ 9).

14.    Pinson became concerned about an unexplained decline in productivity in the Erie plant in the spring of 2004.  (Arb. Tr. 160-161).[2]

15.    In May 2004, Accuride had a target of approximately 77,000 forgings to produce and finished the month of May 6,000 forgings behind.  (Arb. Tr. 164-165).

16.    Accuride's production goal target for June 2004 was 92,000, and by mid-June, Accuride was 17,000 to 18,000 forgings behind where it was supposed to be in the production forging plant.  (Arb. Tr. 164-165).

17.    Pinson was told by employee Aubrey Favors that employees were "slowing their equipment down in the plant, that he would come back from a break, and he would find that his equipment was slower than what it was when he left to go to break" and that Goodwin was the individual engaging in that behavior.  (Arb. Tr. 162-163).

18.    Favors is an African-American male.  (Pinson Dec. ¶ 11).

19.    Goodwin was observed by supervisor Jerry Bruno ("Bruno") running his machine line with robot speeds slower than the standard robot speeds.  (Arb. Tr. 53-66).

20.    Bruno is a Caucasian male.  (Pinson Dec. ¶ 13).

21.    Pinson spoke with employee Bill McGill ("McGill") about Goodwin's performance.  (Arb. Tr. 145-146).

---

[2]    "(Arb. Tr. ___)" and "(Arb. Tr. Joint Ex. ___)" refer to the relevant portions of the Transcript of Proceedings in the Matter of Arbitration Between Accuride Erie LP and U.A.W., Local Union No. 1186, Case No. 051117-00800-7 et al. and exhibits thereto contained in Defendant's Appendix of Exhibits at "B" and "C."

22.     McGill became employed by Accuride on or about May 3, 2004.  (Arb. Tr. 127).

23.     McGill observed production was generally lower on Goodwin's line than when other employees were operating the line; that Goodwin was a "rebel"; that Goodwin had a "bad attitude toward the company" and would say "fuck the company."  (Arb .Tr. 137-141, 168).

24.     McGill is a Caucasian male.  (Pinson Dec. ¶ 14).

25.     Accuride conducted an investigation and concluded Goodwin had participated in a work slowdown by repeatedly telling other employees to "fuck the company," delaying machine line start-ups, slowing down machine line robot speeds, and slowing production by distracting workers.  (Pinson Dec. ¶ 20; Goodwin Dep. Ex. 18[3]).

26.     Pinson testified Accuride "felt confident based on the testimony of a number of different people and some specific incidents that [Goodwin] was, in fact, slowing down the robot speeds and that he was doing things that kept the equipment from operating." (Pinson Dep. 8).[4]

27.     On July 10, 2004, Pinson informed Goodwin that Goodwin was being suspended from work pending an investigation into an alleged violation of Article 42 of the Labor Agreement and Rule 11 of the Rules of Conduct.  (Complaint ¶ 12; Answer ¶ 12).

28.     Goodwin was given a Notice of Preliminary Determination of Termination dated July 21, 2004 and signed by Pinson.  (Pinson Dec. ¶ 21; Pinson Dec. Ex. 7; Goodwin Dep. 8; Goodwin Dep. Ex. 3).

---

[3]   "(Goodwin Dep. __)" and "(Goodwin Dep. Ex. __)" refer to the relevant portions of the deposition and exhibits thereto of Gregory A. Goodwin taken on April 20, 2006 contained in Defendant's Appendix of Exhibits at "D" and "E."

[4]   "(Pinson Dep. __)" refers to the relevant portions of the deposition of Michael Pinson taken on June 28, 2006 contained in Defendant's Appendix of Exhibits at "F."

29.    The decision to terminate Goodwin was a collective decision by Pinson, the Senior Vice President of Human Resources, Robin Hamme ("Hamme"), the Director of Operations at the Erie facility, Rick Klein ("Klein"), the Chief Executive Officer of Accuride, Terry Keating ("Keating"), and Accuride's corporate counsel, Dave Armstrong ("Armstrong"). (Arb. Tr. 160).

30.    Pinson, Hamme, Klein, Keating, and Armstrong are all Caucasians. (Pinson Dec. ¶ 25).

31.    Pinson, Klein, Keating, and Armstrong are all male and Hamme is female. (Pinson Dec. ¶ 26).

32.    Accuride discharged Goodwin for participating in a work slowdown and for slowing down the production effort.  (Arb. Tr. 173).

33.    Goodwin was told by Accuride his termination was due to his violation of Article 42 of the Labor Agreement and Rule 11 of the Rules of Conduct.   (Complaint ¶ 18; Answer ¶ 18).

34.    By letter from Pinson dated July 23, 2004, Accuride informed Goodwin that his employment was being terminated for participating in a work slowdown in violation of Article 42 of the Labor Agreement and Rule 11 of the Rules of conduct.  (Goodwin Dep. Ex. 18).

35.    The letter from Pinson to Goodwin dated July 23, 2004 stated:

The purpose of this letter is to inform you that your employment at the Erie Plant is terminated effective immediately.

You were suspended pending an investigation into your conduct effective July 11, 2004.   As we informed you, we received information that you engaged in conduct that violates Article 42 of the Agreement between Accuride Erie and UAW Local 1186.  In addition, we received information that you engaged in conduct that violates Rule 11 of the Erie Plant Rules of Conduct.  Article 42 of the Agreement provides, in pertinent part, that "the Union will not authorize or knowingly permit employees to cause or take part in

any strikes, work stoppages, slowdowns, or interruptions or cessations of work" and that "any employees" who violate the Article "are subject to discipline and discharge." Rule 11 prohibits, in pertinent part, "any attempt to interrupt production or any aspect of the operations."

On July 20, we met with you and your Union representative and provided you an opportunity to provide any information you considered relevant to the investigation. Thereafter, we carefully reviewed and considered all of the information gathered during the investigation, including the information you provided on July 20. On July 21, we informed you of the preliminary determination to terminate your employment. On July 22, we held a hearing pursuant to Article 7 of the Agreement to review the facts concerning your case with you and your Union representative. The Company made its final determination following the hearing.

Our investigation determined that there was a slowdown in the Erie Plant that included activities such as efforts by employees to fail to work to the best of their ability; to delay startups; to slow down robot speeds; and to stop or limit production equipment from operating. Our investigation indicted that you participated in the slowdown by, among other conduct, repeatedly telling other employees to "fuck the Company"; delaying startups; slowing down robot speeds; and slowing production by distracting workers. Your conduct violated Article 42 of the Agreement and Rule 11 of the Rules of Conduct.

The Company will not tolerate slowdown activities, including efforts to interrupt the Erie Plant's operations. Therefore, your employment is terminated.

Please contact me to make arrangements to remove your belongings, if any, from the Erie Plant, and to return to me all Company property in your possession.

(Goodwin Dep. Ex. 18).

36. The reasons stated in the Notice of Termination letter from Pinson to Goodwin dated July 23, 2004 were the reasons for Goodwin's termination. (Pinson Dep. 11-12, 25-26; Goodwin Dep. Ex. 18).

37. Goodwin's employment was terminated by Accuride effective July 23, 2004. (Complaint ¶ 10; Answer ¶ 10).

38.     No Accuride manager ever told Goodwin his termination was due to any reason other than the correspondence to Goodwin concerning his termination.   (Goodwin Dep. 8-9).

### Goodwin Filed A Grievance For His Termination That Was Arbitrated Under The Labor Agreement

39.     Goodwin filed a Grievance dated July 22, 2004, pursuant to the Labor Agreement, protesting his termination and seeking reinstatement.   (Arb. Tr. 7; Arb. Tr. Joint Ex. 7).

40.     Goodwin's Grievance stated:

I protest managements [sic] actions of giving me an unjust termination on 7-21-04.

I charge management with violating Article 4 and Article 7.1.  I charge management with making false and fraudulent accusations towards me.   I have not violated Article 42 of the Labor Agreement or the Rules of Conduct in any way, shape, or form.

I demand that my termination be lifted immediately, that I be returned to work, my record be cleared, and I be made whole for all losses sustained as a result of management's unjust actions.

I file this grievance at step 3 of the grievance procedure in accordance with Article 7.2.

(Arb. Tr. Joint Ex. 7).

41.     Goodwin submitted a handwritten memo dated July 27, 2004 supporting his Grievance.  (Arb. Tr. 7; Arb. Tr. Joint Ex. 8).

42.     Goodwin complains in his memo that, inter alia:

Looking back on or about Feb 13, 2004 on third shift, Sabrina Gore was told to work the end of the line #6 by Mr. Bruno. Sabrina Gore told him to go fuck himself and walked out.  She refused to do the job and left.  By doing this, machine line #6 sat idle for 8 hrs.

> This was a blatant display of Article 42 (work stoppage).  Sabrina Gore was only suspended for 1 day without pay which was determined three weeks later to be the day she left.
>
> I feel this is an unfair practice, a selective unfair labor practice and harassment [sic].  I demand that these practices stop, my record be cleared and I be made whole.
>
> She only received 1 day without pay for an obvious work stoppage and I've been terminated for unjust reasons, and not an incident on file.

(Arb. Tr. 7; Arb. Tr. Joint Ex. 8).

43.    Goodwin does not allege in his Grievance or supporting memo that the difference in Gore's discipline and his discipline by Accuride was due their race or sex.  (Arb. Tr. Joint Ex. 7, 8).

44.    On October 25, 2005, an arbitration hearing on Goodwin's Grievance was held before Arbiter Donald C. O'Connor in Erie, Pennsylvania.  (Arb. Tr. 1).

45.    The issue before Arbiter O'Connor was whether Accuride had just cause for the discharge of Goodwin.  (Arb. Tr. 7-8).

46.    Accuride's position at the arbitration hearing was that Goodwin, in May and June 2004, participated in slowdown activities in the Accuride plant by delaying machine start-ups, taking excessively long breaks, slowing robot speeds on automated equipment, and slowing production by distracting and interfering with co-workers.  Accuride further contended that Goodwin encouraged his co-workers to slow down their production.  (Arb. Tr. 12-15).

47.    The Arbiter found the "preponderance of the credible evidence supports the proposition that [Goodwin's] conduct did violate Rule 11."  (Opinion and Award 29).[5]

---

[5]  "(Opinion and Award ___)" refers to the Opinion and Award of Arbitrator Donald T. O'Connor dated February 11, 2006 contained in Defendant's Appendix of Exhibits at "G."

48.    In connection with Accuride's investigation of Goodwin's conduct, the Arbiter concluded "I am of the view that under the circumstances, the Company's investigation was thorough and fair." (Opinion and Award 31).

49.    In connection with the Union's claim that there was a disparity between Accuride's treatment of Goodwin and its treatment of Gore, the Arbiter concluded there was no disparate treatment and explained:

> The Union claims that there is a disparity of treatment between the Grievant's conduct and that of a co-employee, Sabrina Gore. On March 24th, Ms. Gore was given a one day disciplinary suspension for leaving her work area and abusive her supervisor an abusive response [sic] when directed by him to return to her work area. Her supervisor sent her home and the time was counted as the one day off without pay (UX-4). The Union claims that she only received one day for violating the same rule that the Grievant is charged with violating, i.e. Rule 11. Although the Grievant was charged specifically with violating Rule 11, Ms. Gore's disciplinary notice fails to designate by number which rule or rules she violated. Reviewing the disciplinary notice, it appears that she was charged with violating Rules number 1 and 5. The Union claims that she left the plant on the night in question and only received one day off. However, the evidence is pretty clear that Ms. Gore did not go home on her own, but was sent home by her supervisor, Jerry Bruno. See Union Exhibit 4 and the testimony of Gary Montroy, the current Local Union President who said that Bruno said to him that night he was going to shut her machine line down "and she is going home" (TR. 226). As the rule violations and the conduct involved are quite different, I cannot conclude there was disparate treatment.

(Opinion and Award 30).

50.    The Arbiter concluded:

[Goodwin] did not engage in a slowdown prohibited by Article 42 of the Agreement, **but did purposely slow equipment down in violation of Rule 11**. As a result he should be reinstated with full seniority, but without back pay. A warning should be placed in his personnel file that future unjustified slowdowns may result in his discharge.

(Opinion and Award 37) (emphasis added). Donald O'Connor has thirty-four years of labor and employment law experience in private practice and four years of experience as a labor and employment arbitrator/mediator, having served as an arbitrator in fourteen disputes.[6]

### Employees Other Than  Goodwin Were Disciplined As A Result Of Accuride's Investigation Of A Work Slowdown

51.    Employees other than Goodwin were disciplined as a result of Accuride's investigation of a work slowdown. (Arb. Tr. 173).

52.    Accuride employee Doug Ferguson ("Ferguson") was discharged as a result of Accuride's investigation of a work slowdown. (Arb. Tr. 173, 176).

53.    Ferguson is a Caucasian male. (Pinson Dec. ¶ 15).

54.    At the time he was discharged by Accuride, Ferguson was the Union President. (Pinson Dec. ¶ 17).

55.    Ferguson was informed of his termination by letter from Pinson dated July 21, 2004. The letter states:

The purpose of this letter is to inform you that your employment at the Erie Plant is terminated effective immediately.

You were suspended pending an investigation into your conduct effective July 8, 2004. As we informed you, we received information that you engaged in conduct that violates Article 42 of the Agreement between Accuride Erie and UAW Local 1186. In addition, we received information that you engaged in conduct that violates Rule 11 of the Erie Plant Rules of Conduct. Article 42 of

---

[6]  A copy of Donald T. O'Connor's résumé is attached to Defendant's Appendix of Exhibits at "H."

the Agreement provides, in pertinent part, that "the Union will not authorize or knowingly permit employees to cause or take part in any strikes, work stoppages, slowdowns, or interruptions or cessations of work" and that "any employees" who violate the Article "are subject to discipline and discharge." Rule 11 prohibits, in pertinent part, "any attempt to interrupt production or any aspect of the operations."

On July 15, we met with you and your Union representatives and provided you an opportunity to provide any information you considered relevant to the investigation. Thereafter, we carefully reviewed and considered all of the information gathered during the investigation, including the information you provided on July 15. On July 19, we informed you of the preliminary determination to terminate your employment. On July 20, we held a hearing pursuant to Article 7 of the Agreement to review the facts concerning your case with you and your Union representative. The Company made its final determination following the hearing.

Our investigation determined that there was a slowdown in the Erie Plant prior to July 8, 2004, that included activities such as efforts by employees to fail to work to the best of their ability; failures to perform equipment checks in a manner to facilitate efficient operations; and efforts to increase equipment cycle times, to stop or limit production equipment from operating, and to limit uptime. Our investigation indicated that you instigated and supported the slowdown, in violation of Article 42 of the Agreement and Rule 11 of the Rules of Conduct.

The Company will not tolerate slowdown activities, including interruptions or cessations of the Erie Plant's operations. Therefore, your employment is terminated.

Please contact me to make arrangements to remove your belongings, if any, from the Erie Plant, and to return to me all Company property in your possession.

(Pinson Dec. ¶ 16; Pinson Dec. Ex. 6).

56.    Accuride employee Ed Gatti ("Gatti")[7] was issued a two-week suspension as a result of Accuride's investigation of the work slowdown. (Arb. Tr. 173-174).

57.    Gatti is a Caucasian male. (Pinson Dec. ¶ 18).

---

[7] Gatti's name was misspelled as "Gaddi" in the arbitration hearing transcript. See Pinson Dec. ¶ 18.

## Goodwin Filed A Charge With The National Labor Relations Board

58.    Goodwin filed a National Labor Relation Board Charge Against Employer

("NLRB Charge") on July 30, 2004. The  NLRB Charge stated:

> On or about July 11, 2004, the above-named employer, by its officers, agents and representatives indefinitely suspended the employment of Gregory Goodwin and others, because of their membership in and activities on behalf of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), Local 1186, AFL-CIO, a labor organization, because they engaged in concerted activities with other employees of said employer for the purpose of collective bargaining and other mutual aid and protection and in order to discourage membership in said labor organization.  At all times since said date, and for the aforesaid reasons, the said employer has refused, and does now refuse to employ the above-named employees.

 (Goodwin Dep. 9; Goodwin Dep. Ex. 9).

59.    The NLRB Charge does not allege that Goodwin's treatment by Accuride

was due to Goodwin's race or sex.  (Goodwin Dep. Ex. 9).

60.    The NLRB Charge was withdrawn on or about March 27, 2006.  (Pinson

Dec. ¶ 33; Pinson Dec. Ex. 11).

## Goodwin Filed A Charge Of Discrimination
## With The EEOC That Was Dismissed For Lack Of Merit

61.    On or about October 9, 2004, Goodwin filed a Charge of Discrimination

with the U.S. Equal Employment Opportunity Commission ("EEOC") claiming he was

discriminated against because of his race and sex.  Goodwin specifically claimed he was treated

differently than Gore, a black female.  (Goodwin Dep. 9; Goodwin Dep. Ex. 6).

62.    The EEOC investigated Goodwin's discrimination claims and issued a letter to Goodwin stating its conclusion that Goodwin's discrimination claims were not substantiated.  The letter stated:

> Your charge of employment discrimination referenced above was investigated pursuant to the Commission's policies and procedures in which it was determined the allegations were not substantiated as indicated below:
>
> You alleged that the Respondent discriminated against you because of your race/white and sex/male by suspending you from your position of Machine Line Operator on July 10, 2004, and by discharging you from said position on or about July 23, 2004, in violation of Title VII of the Civil Rights Act of 1964, as amended (Title VII).
>
> You were advised of the Respondent's defense by a letter from the Equal Employment Opportunity Commission (EEOC) on or about November 29, 2004.  On or about December 13, 2004, you submitted a rebuttal for the EEOC's review.  Subsequent to the submission of your rebuttal, the EEOC reviewed information from the National Labor Relations Board (NLRB) concerning the referenced matter on December 29, 2004.
>
> However, after an examination of the information provided by you, the Respondent, the NLRB, and witness testimony, the EEOC is unable to conclude that your race and/or sex were factors in the alleged harms.
>
> Therefore, the EEOC has determined that it is unlikely that further investigation will result in a finding of a violation against the Respondent.  Accordingly, please find enclosed the Commission's Dismissal and Notice of Rights.  If you wish to pursue this matter further, you may file a lawsuit on your own behalf within 90 days of your receipt of the attached notice.

(Goodwin Dep. Ex. 5).

63.    Goodwin received a letter from the Pennsylvania Human Relations Commission dated May 24, 2005 stating the PHRC closed Goodwin's case because it was "unable to conclude that the information obtained establishes violations of the statutes." (Goodwin Dep. 10; Goodwin Dep. Ex. 5a).

## Goodwin's Allegations of Discrimination

64.     On or about July 28, 2004, Goodwin submitted a General Information Questionnaire ("EEOC Questionnaire") to the EEOC Pittsburgh office in connection with his Charge of Discrimination.  (Goodwin Dep. 10-11, 15-16; Goodwin Dep. Ex. 7).

65.     Goodwin explained the alleged reasons for his treatment by Accuride in the EEOC Questionnaire, in part, as follows:

> Retaliation – I am being treated differently because Dave Shingledecker (supervisor) and Ross Russo (supervisor) do not like me and told Kevin Rouse to tell Michael Pinson HR Manager that "I am no good" – "Fuck Goodwin, he's an Asshole" – "I am a trouble maker" and say he told you "fuck the company", "tell them anything "Rouse" they want to hear"

> When Kevin Rouse was called in to Michael Pinson's office Michael Pinson lied and said "I" Greg Goodwin" spilled the beans on him "Rouse" – to get him to lie.

> I was never asked about Kevin Rouse in my meeting – there was nothing to tell.

> When Kevin Rouse went in to his meeting he told the truth and was suspended without pay.

(Goodwin Dep. 10-11; Goodwin Dep. Ex. 7).

66.     When asked in discovery to identify the facts supporting the allegations of sex discrimination in his Complaint, Goodwin's complete response was "Ms. Gore refused to do a job and created a work stoppage slow down.  She received only 1 day off to be determined 3 wks. later as the day she walked out."  (Plaintiff's Answers and Responses to Defendant's First Set of Interrogatories and Requests for Production of Documents Directed to Plaintiff, Interrogatory No. 10).[8]

---

[8]     The relevant portions of Plaintiff's Answers and Responses to Defendant's First Set of Interrogatories and Requests for Production of Documents Directed to Plaintiff are attached to Defendant's Appendix of Exhibits at "I."

67.    When asked in discovery to identify the facts supporting the allegations of race discrimination in his Complaint, Goodwin's complete response was:

> Ms. Gore – same as above – Dan Kelley suspended. Greg Goodwin – terminated.
>
> Aubrey Favors – aggressor in locker room against John Plyler. John Plyler received a written warning and was in fear of termination.  Mr. Favors the aggressor received nothing and was later promoted to management.

(Plaintiff's Answers and Responses to Defendant's First Set of Interrogatories and Requests for Production of Documents Directed to Plaintiff, Interrogatory No. 11).

68.    When asked to identify each individual employed by Accuride who Goodwin contends was treated more favorably than Goodwin because of that person's sex, Goodwin identified only Sabrina Gore and Aubrey Favors.  (Plaintiff's Answers and Responses to Defendant's First Set of Interrogatories and Requests for Production of Documents Directed to Plaintiff, Interrogatory No. 17).

69.    Aubrey Favors is actually a black male.  (Pinson Dec. ¶ 11)

70.    When asked to identify each individual employed by Accuride who Goodwin contends was treated more favorably than Goodwin because of that person's race, Goodwin identified only Sabrina Gore and Aubrey Favors.  (Plaintiff's Answers and Responses to Defendant's First Set of Interrogatories and Requests for Production of Documents Directed to Plaintiff, Interrogatory No. 18).

**Sabrina Gore Was Disciplined By Accuride**

71.    Sabrina Gore ("Gore") is a black female, hired by Accuride as a production worker on or about June 3, 2002.  (Pinson Dec. ¶ 29).

18

72.    Gore was disciplined with a one-day suspension without pay in connection with her misconduct on March 13, 2004.  (Pinson Dec. ¶ 30; Pinson Dec. Ex. 8).

73.    The letter from Pinson dated March 24, 2004 informing Gore of her disciplinary suspension for her conduct on March 13, 2004 states:

> The purpose of this letter is to inform you that you are being issued a one day disciplinary suspension in connection with your misconduct on or about Saturday, March 13, 2004.
>
> Our investigation established that on or about March 13, a dispute arose concerning your work assignment near the beginning of your shift.  You left your assigned work area, without authorization, for approximately on hour while you discussed the dispute with your supervisor, union representative and other employees in the area.  Later you were sent home because of your abusive response to your supervisor's directive to return to your assigned work station.
>
> The Erie Plant Rules of Conduct prohibit "failure to follow directions or instructions."  The Rules of Conduct also prohibit "absence from your assigned job or work area without permission."  Your conduct on or about March 13 violated these basic rules of acceptable behavior.
>
> It is imperative that employees at the Erie Plant follow the directions of supervisors and remain in their work areas unless authorized to leave.  If you disagree with a supervisor's directions, you must "work now and grieve later."  Future unauthorized absence from your area, failure to follow supervisor's instructions, or similar misconduct will result in additional discipline, up to and including termination of your employment.
>
> The shift that you missed on or about March 13 as a result of being sent home by your supervisor will be counted as your one day suspension.

(Pinson Dec. ¶ 30; Pinson Dec. Ex. 8).

74.    Gore's discipline in March 2004 was the first time she was disciplined by Accuride.  (Gore Dep. 10-11).[9]

---

[9]    "(Gore Dep. __)" refers to the relevant portions of the deposition of Sabrina Gore taken on June 28, 2006 contained in Defendant's Appendix of Exhibits at "J."

75.     Gore was disciplined with a three-day suspension without pay in connection with her misconduct on June 12, 2004.  (Pinson Dec. ¶ 31; Pinson Dec. Ex. 9).

76.     The letter from Pinson dated June 25, 2004 informing Gore of her disciplinary suspension for her conduct on June 12, 2004 states:

> The purpose of this letter is to inform you that you are being issued a three day disciplinary suspension in connection with your misconduct on or about Saturday, June 12, 2004.
>
> Our investigation established that during your shift on June 12, you became involved in an incident with another employee that resulted in the improper posting of a racially charged message at the Mid-Line position on Machine Line 7.  Our investigation also established that the incident was the result of horseplay.
>
> The Erie Plant Rules of Conduct prohibit "engaging in 'horseplay,' or other conduct which might lead to injury to yourself or others, damage to tools or equipment, or disrupt operations."  The Rules of Conduct also prohibit engaging in conduct that violates the Company's policy prohibiting racial discrimination and harassment.  Your conduct on or about June 12 violated these essential work requirements.
>
> It is imperative that employees at the Erie Plant refrain from engaging in offensive conduct, racist conduct, and conduct that could cause coworkers to feel harassed.  We are committed to providing all employees with a safe work environment that is free from racial discrimination.  We will not tolerate any conduct of a racial nature that violates these fundamental principles.
>
> Although your misconduct was the result of an incident of horseplay, we cannot and will not allow misconduct that has the potential to seriously offend coworkers and disrupt operations.  In this case, your posting was observed by a coworker who was seriously offended by its content.
>
> Under the circumstances, the discipline that is being issued to you is minor.  Similar misconduct in the future will result in additional discipline up to and including termination of your employment.

> Your suspension without pay will begin on Wednesday, July 7, and will continue until Friday, July 9. You are expected to return to work at your scheduled starting time on Monday, July 12, unless otherwise directed.

(Pinson Dec. ¶ 31; Pinson Dec. Ex. 9).

77.    Gore was disciplined with a three-day suspension without pay in connection with her misconduct on March 24, 2005. (Pinson Dec. ¶ 32; Pinson Dec. Ex. 10).

78.    The letter from Pinson dated April 12, 2005 informing Gore of her disciplinary suspension for her conduct on March 24, 2005 states:

> The purpose of this letter is to inform you that you are being issued a three day disciplinary suspension in connection with your misconduct that occurred on Thursday, March 24, 2005.
>
> Our investigation established that near the beginning of the 3rd shift on March 24, you were notified that you were assigned to run Machine Line 10. Subsequently there was an argument between you and a coworker as to who was assigned to run Machine Line 10. You were using abusive and profane language directed at a coworker. Additionally, you pushed your coworker with your hands and bumped him with your shoulder.
>
> The Erie Plant Rules of Conduct prohibit "Inciting trouble, fighting, provoking, attempting bodily injury, profanity, abusive or threatening language, engaging in threatening conduct, or creating any other disturbance which could endanger the safety of employees or disrupt operations." Your conduct on or about March 24, violated this basic rule of acceptable behavior.
>
> It is imperative that employees treat other employees in a respectful manner at all times. Threatening and physically abusive behavior will not be tolerated. Particularly in view of your prior discipline arising out of disrespectful conduct towards coworkers and your failure to follow instructions, your misconduct on March 24 is very troubling. We expect immediate, dramatic improvement in your behavior in the Plant. Future behavior involving disrespectful, threatening or physically abusive behavior will result in your discharge. We agree with your assessment during your recent interview concerning your behavior that you must take steps to ensure that you will "never ever be in this office (HR) again" for additional discipline.

> Your suspension without pay will begin on Tuesday, April 12, and
> will continue until Thursday, April 14. You are expected to return
> to work at your scheduled starting time on Friday, April 15, unless
> otherwise directed.

(Pinson Dec. ¶ 32; Pinson Dec. Ex. 10).

## Evidence Militates Against A Finding Of Reverse Discrimination

79.    Between 2002 and 2004, Accuride terminated six hourly and salary

employees for cause. The terminated employees were:

| NAME | PAY GROUP | SEX | RACE | DATE | REASON FOR DISCHARGE |
|------|-----------|-----|------|------|----------------------|
| Daniel Potts | Salary | Male | Caucasian | 11/4/2002 | Job Performance |
| Toby J. Shaffer | Hourly | Male | Caucasian | 11/12/2002 | Theft of Aluminum billets |
| Robert E. McDonald | Hourly | Male | Black | 2/24/2003 | Refusal to allow photo for ID badge |
| Timothy W. Jordan | Hourly | Male | Black | 5/5/2004 | Sleeping on job, 2nd offense |
| Douglas G. Ferguson | Hourly | Male | Caucasian | 7/21/2004 | Work slowdown |
| Gregory Goodwin | Hourly | Male | Caucasian | 7/23/2004 | Work slowdown |

(Pinson Dec. ¶ 27).

80.    On the date that Goodwin was terminated, the sex and race makeup of the

Accuride hourly work force was: 121 white males; 11 black males; 3 white females; 2 black

females. (Pinson Dec. ¶ 28).

81.    Gary Montroy ("Montroy") became the President of the Union in

approximately May 2005. (Montroy Dep. 6).[10]

82.    Prior to becoming Union President, Montroy was a Union Vice President

and Union committee person, and Union steward. (Montroy Dep. 9-10).

83.    Montroy has had a Union role in grievances for "probably 20 years."

(Montroy Dep. 10).

---

[10] "(Montroy Dep. __)" refers to the relevant portions of the deposition of Gary Montroy taken on May 31, 2006 contained in Defendant's Appendix of Exhibits at "K."

84. Montroy has been an employee of Accuride, or its predecessors, for 33 years. (Montroy Dep. 6).

85. Montroy testified that he did not know why Goodwin was terminated by Accuride and Gore was not:

> Q. My question is, if you know, how come you have one person whose disobedience results directly in reduced production is not terminated, you have another person who is simply accused of a slow down, there is no slow down in production and he gets terminated?
>
> . . .
>
> A. I don't know.

(Montroy Dep. 25-26).

86. Montroy testified about the incident in which Gore was disciplined for a writing that said "white power" as follows:

> Q. There's another instant. Do you remember an instant concerning a sign that said white Power?
>
> A. Yes, I'm familiar with it, yes.
>
> Q. What do you know about it?
>
> A. What I know about it is that her and a fellow worker were good friends. He was white and she's black. And they played games with each other. And it had to do with race. I mean, they called each other names. It was more like those two people getting along, that's how they got along.
>
> Q. Who was that person?
>
> A. Steve Coughlin.
>
> Q. Steve?
>
> A. Coughlin.
>
> Q. C-o-u-g-h-l-i-n?
>
> A. Yes.

Q.      All right.

A.      And someone found something that Steve had written on her magazine or something.  I can't remember what it was.  And it was only for her eyes only.  And it was for nobody else.  But someone found it.  And what happened finally was the company found out about it, and **they don't tolerate anything racial**.  And I think they both got a day off or two days.  I can't remember how much time they got off, but they were both disciplined for it.

(Montroy Dep. 14-15) (emphasis added).

Respectfully submitted,

JACKSON LEWIS LLP


By: _/s/Mark Goldner_____
     Martin J. Saunders
     PA ID #19940
     saunderm@jacksonlewis.com
     Mark Goldner
     PA ID #75938
     goldnerm@jacksonlewis.com
     One PPG Place, 28th Floor
     Pittsburgh, PA 15222
     Phone (412) 232-0404
     Fax (412) 232-3441

     ATTORNEYS FOR DEFENDANT

Dated:  August 31, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2006, I electronically filed the foregoing *Defendant's Concise Statement of Material Facts in Support of Motion for Summary Judgment* with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Joseph H. Chivers, Esquire
312 Boulevard of the Allies, Suite 600
Pittsburgh, PA 15222

*/s/ Mark Goldner*