# Exhibit G

IN THE MATTER OF ARBITRATION BEFORE
ARBITRATOR DONALD T. O'CONNOR, ESQ.

Between:                              )
                                      )
Accuride Erie LP,                     )
                Employer              )
                                      )    FMCS Case No.:
                and                   )    051117-00800-7
                                      )    et al.
                                      )    Discharge of:
International Union, United Automobile, )   Greg Goodwin
Aerospace and Agricultural Implement  )
Workers of America, Local No.  1186   )
                                      )
_____   )

<u>OPINION AND AWARD</u>

<u>Appearances</u>:
            For the Employer - Frederick C. Miner,
                            Attorney

            For the Union-Louis C. Stagner,
                    International Staff Representative

I- INTRODUCTION

    These arbitration cases arise pursuant to a collective

bargaining agreement ("CBA")(JX-1) between Accuride Erie

("Employer" or "Company")and the International Union, United

Automobile, Aerospace and Agricultural Implement Workers of

America, Local No. 1186 ("Union") covering all production,

maintenance, laboratory testers, and storeroom clerk employees

employed at the Company's Erie, Pennsylvania plant. (See Article

1, Section 1.2-Recognition, page 1 of the CBA)(JX-1).1/

Four grievances involving the suspension and discharge of Greg

Goodwin (hereinafter referred to as the "Grievant") were filed in

July 2004 2/ 3/  Since the parties at the hearing agreed that the

---

1/ "JX__" refers to Joint Exhibits, "EX__" refers to Employer Exhibits, "UX__" refers to Union Exhibits, and "TR__" refers to the Transcript from the hearing.
2/      Grievance 04-48-ML14 (JX-6) was filed on July 21, 2004 by Greg Goodwin and reads:

> I protest management's actions in giving me an unjust disciplinary suspension on July 11, 2004.
>
> I charge management with violating Article 7.1.  I charge management with making false and fraudulent accusations toward me.  I have not violated Article 42 [the no-strike clause] of the Labor Agreement or the Rules of Conduct in any way, shape, or form.
>
> I demand that my suspension be lifted immediately. That I be returned to work, my record be cleared, and I be made whole for all losses sustained by me as a result of managements (sic) actions.

Grievance 04-51-ML16 (JX-7) was filed on July 22, 2004 by Mr. Goodwin and reads:

> I protest managements (sic) actions of giving me an unjust termination on 7-21-04.
>
> I charge management with violating Article 4 and Article 7.1.  I charge management with making false and fraudulent accusations toward me.  I have not violated Article 42 of the Labor Agreement or the Rules of Conduct in any way, shape, or form.
>
> I demand that my termination be lifted immediately, that I be returned to work for all losses sustained as a result of management's unjust actions.
>
> I file this grievance at Step 3 of the grievance procedure in accordance with Article 7.2.

Grievance 04-54-ML16 (JX-8) was filed on July 27, 2004 by Mr. Goodwin and reads:

> On July 10, 2004 I was suspended without pay until

2

further notice for violating Article 42 of the contract. Which is causing a work stoppage and slowdown. I asked what incident this had to do with and was told article 42. There was no occurrence given to me at that time. On July 23, 2004 I was terminated without just cause.

Looking back on or about February 13, 2004 on the third shift (sic). Sabrina Gore was told to work the end of the line #6 by Mr. Bruno. Sabrina Gore was told to work the end of the line #6 by Mr. Bruno. Sabrina Gore told him to go fuck himself and walked out. She refused to do the job and left. By doing this, machine line #6 sat idle for 8 hrs.

This was a blatant display of article 42 (work stoppage). Sabrina Gore was only suspended for 1 day without pay, which was determined three weeks later to be the day she left.

I feel this is an unfair practice, a selective unfair labor practice and harassment. I demand that these practices stop, my record be cleared and I be made whole.

She only received 1 day without pay for an obvious work stoppage and I've been terminated for unjust reasons, and not an incident on file.

Grievance 04-55-SP12 (JX-9) was filed on July 28, 2004 by Fred Petrusch, a Committee Person. It reads:

I protest management's actions with the way they improperly handled the termination process of Greg Goodwin. As stated in Article 7 (7.2- Discharge procedure), after the Company makes a preliminary determination to discharge an employee, a hearing (to review the facts) will be held. At this so-called hearing that was held on July 20, 2004 the company refused to review any facts or offer any information supporting their charges against Greg Goodwin.

I charge the Company with deliberately violating Article 7 by refusing to review any facts during the hearing and as of yet, has not offered the Union a single stick of evidence or a single fact that supports the charges they brought against Mr. Goodwin.

I demand that the Company adhere to the Articles set forth in the labor agreement between Accuride and UAW Local 1186. I also demand that Greg Goodwin be returned to work, his record cleared and he be made whole for all losses sustained as a result of management's actions.

3

issues are whether there was just cause for the discharge of the
Grievant, and if not, what is the appropriate remedy, I will
treat all four grievances as one unless otherwise indicated. 4/

The Company at the time it discharged the Grievant claimed
that he "participated in [a] slowdown by, among other conduct,
repeatedly telling other employees to 'fuck the Company';
delaying startups; slowing down robot speeds; and slowing
production by distracting workers, all in violation of Article 42
(the no-strike clause) and Rule 11 (a rule which prohibits "any
attempt to interrupt production or any aspect of the operations")
(emphasis supplied)(JX-5). However, at the hearing, the Company
stated that the case was not "about enforcement of the no-strike
clause, with respect to a slow down." It contended that
Grievant's conduct, individual slowdown, justified the Company's
discharge of him.

The Union contended that the discharge was unjust since the
Company did not establish that the Grievant was involved in any
slowdown and that he did not encourage co-workers to slow down
their production. Further, the Union argues that the
investigation into the alleged slowdown by the Grievant was
perfunctory, not fair or objective. The Union claims that

_____

3/ Unless otherwise indicated, all dates refer to 2004.
4/ At the hearing, the Union submitted to me a Notice to Arbitrator, NLRB Form
5433, notifying me that an unfair labor practice charge against the Company in
Case No. 6-CA-34231 has been with the approval of both parties been deferred
to arbitration. A copy of the charge was not provided, and I was not apprised

4

testimony received by the Company was obtained "through
intimidation, using leading questions to solicit certain answers,
and then manipulate those answers to further build their case."

The undersigned was selected by the parties, through the
auspices of the Federal Mediation and Conciliation Service
("FMCS"), to conduct a hearing and render a binding arbitration
award.  A hearing was held on October 25, 2005 at the Company's
facility in Erie, Pennsylvania.  At the request of the Company
all witnesses, but the Grievant and the Human Resource Manager,
were sequestered.  At the hearing, the witnesses were sworn-in;
the parties were afforded the opportunity to examine and cross-
examine the witnesses, to introduce relevant exhibits, and the
testimony was transcribed by a court reporter.  The parties
waived making closing arguments and instead filed timely post
hearing briefs.


                            II- FACTS


A. Background

The Company manufactures at its Erie, Pennsylvania plant
aluminum truck wheels.  The Grievant a two-year employee worked
as a Machine Line Operator on the machine line.  The production
flow is that aluminum stock is cut in a "BCO" or billet
operation.  The billets are then put in a hydraulic press, or

---

as to what the nature of the charge is.

forge area, where they are molded into the shape of a truck
wheel.  The resulting forging then goes to a spin area and then
to heat treat.  The aluminum wheel then is taken to the machine
line, where the grievant worked.  They are machined and finished,
ready for shipment to the customer.

At the time of the Grievant's discharge in July of 2004,
there were two such lines.5/  Machining of wheels at the time was
performed on two identical, fully automated lines that were
relatively new to the Erie plant.  The wheels are moved down a
conveyor where a robot picks up the wheels and puts them into an
"Okuma Cell", where they are machined down to size (inside and
outside of the wheel) and pre-stressed. The wheels are then put
back on the conveyor by the robot where they then go to a second
robot that picks them up and places them into a "Chiron Cell",
where the holes are drilled in them.  From there the conveyor
takes them to a third robot, which picks them up and places them
in a "Coining Cell", where the wheels are "coined" and polished.
The wheels are then rinsed and taken by a conveyor to a Machine
Line Operator, on the back of the line, who will "valve stem
them", "roll stamp them" and then using a hoist will pile them on
a pallet for shipping to the customer.

Between the two machine lines, there were five Machine Line
Operators- one each on the front of the line, one each on the
rear of the line and a fifth who helped out in the middle and

6

relieved the other four Operators, called a "tag person." All five had the same classification and would rotate positions on a regular basis.

A critical factual issue in this case is at what speeds the robots at the three cells were to run. The Company introduced much evidence that the speed at the Okuma Cell should be 65 percent, and 45 percent at both the Chiron and the Coining Cells. The Union attempted to refute this, but not successfully. There was some testimony that the speeds were posted at the time the Grievant was discharged, but other testimony that it was not posted at the time. I find that the Company did not establish that the speeds were posted at the time of the Grievant's discharge. However, I find by a preponderance of the credible evidence that the speeds of 65%, 45%, and 45% were well established and known by all operators at the time of the Grievant's discharge.

B. The Events Leading up to the Discharge of the Grievant

In the spring of 2004, Michael Pinson, the Human Resource Manager, testified that he first became concerned that there might be a slow down occurring. This was, according to Pinson, especially true in the forging area where there were "some pretty low levels of efficiency." He testified that in April 2004 there was a unexpected decline in the numbers. In mid-June, he said he

---

5/ Since the Grievant's discharge, a third line has started up.

stumbled into a strange thing on the floor. Pinson testified that

on June 10th he had Machine Line Operator Aubrey Favors in his

office as part of the Company's investigation into a possible

slowdown.  Favors purportedly told Pinson "there was...some

strange happenings on the shop floor." 6/  Pinson said that

Favors went on to tell him that "people were slowing their

equipment down in the plant, that he would come back from a

break, and he would find that his equipment was slower than what

it was when he left to go on the break." Favors identified the

Grievant as the one who set the speed of the equipment back. 7/

---

6/ There was testimony indicating that the President of the Local Union at the
time, Doug Ferguson was suspended and then discharged for participating in a
slow down, which discharge was subsequently converted to a voluntary
retirement. However, there was no evidence that the Grievant's conduct was at
all tied into the slowdown that Ferguson was allegedly involved in.  Further,
there was no evidence that there was any labor objective that they,
collectively or individually, were trying to accomplish.
   At the hearing, the Company attorney in his opening statement made the
startling statement that "[t]his case isn't about enforcement of the no-strike
clause, with respect to a slow down." (TR.- 15). This was reinforced in a
colloquy that took place at TR. 184-86 during the direct examination of
Pinson, when I asked Company counsel-" I heard your opening statement that you
are not contending that his discharge was based on a violation of the no
strike clause, no slow down provision, but purely his own production, and I am
wondering if that's true, why am I looking at anything other than production
records for the machine line?" Company counsel responded by saying that he
was offering it as background information to show that there was a larger slow
down in operations. When I said to Company counsel "...you are not contending
[the Grievant] was a participant in a concerted work stoppage,...slow down" he
replied "Yes, we are claiming that his conduct was participation in a larger
slow down. We are focusing on his particular misconduct in this case, that's
sufficient to warrant his discharge." I responded by asking "Whether he was
involved in a concerted activity, or not, with others, you are not contending,
and you are not hanging your hat on that, <u>you are hanging your hat purely on
his individual efforts.</u>" Company counsel responded by saying "<u>Correct.  We
are not going to try and prove other employee's misconduct in other areas of
the plant</u>" (emphasis supplied).
7/ In September 2004, Favors was made a shift supervisor on the second shift.
The Union in its Post Hearing Brief argues that his "testimony is flawed in
too many places to give any credibility.  The Union claims that Favors was in
search of a position in management at the time and is now looking to save this
position he was eventually given." (Union Post Hearing Brief,p.6).  Although,
I do not give great weight to Favors' testimony by itself, others corroborated

8

According to Pinson the Company decided not to start a "full-blown investigation" until after the annual shutdown in late June and early July. On Monday, July 7 the investigation resumed.8/ In a meeting on July 7 with supervisors, Bill McGill, who was a Machine Line Operator at the time, was identified as an employee that Pinson should talk to in his investigation. The next day Pinson met with McGill in a nearby McDonald's restaurant. According to Pinson, McGill asked to meet off property because he was concerned about his and his family's safety. McGill told Pinson that the Grievant would routinely come into work and say to co-employees-"Let's fuck Accuride." McGill told Pinson that the Grievant said that he "was slowing the robots down." Pinson said that McGill claimed that he saw the Grievant slow down the robot speed.9/

Based on the information obtained from Favors and McGill the Company suspended the Grievant on July 10 and converted the

most of it. There was absolutely no evidence that he was "in search of a position in management" at the time of the report or that his being made a supervisor was a *quid pro quo* for his cooperation.

8/ On that date the then President of the Local Union was suspended for participating in a slow down. As noted above, there was no evidence tying Ferguson's slowdown with that of the Grievant, and there did not appear to be any labor object for their slowdowns. The Company placed into evidence EX-2 which was a chart showing productivity on various plant operations before the machine line, and EX-3 which showed the plants "Controllable Cost per Equivalent Unit" to demonstrate there was a slow down going on. Since the sole issue is whether the Grievant engaged in an individual slow down on the machine line, Employer Exhibits 2 is irrelevant, and Employer Exhibit 3 is not probative of whether the grievant worked at a slow pace.

9/ Pinson did not give any detail on what McGill might have seen or when.

9

suspension to a discharge on July 22 for "participating in a work slow down, for slowing down the production effort."10/

### C. The Company Witnesses

1.    *Aubrey Favors*-testified that he worked with the Grievant as a Machine Line Operator.  He said that the Grievant would regularly say, "We should fuck the Company."  Favors said that the Grievant would say that to him and to "everyone else in the area, pretty much, on a regular basis... several times a day when I worked with him."  Favors testified that the Grievant would say he wasn't going to give the Company anymore than he had to. He said that the Grievant "would do things to slow down production."  According to Favors, the Grievant would slow down the robots by adjusting the speeds down "real low."  While the supervisors told the crew to run the robots at 65% in the front and either 50 or 45% in the middle, as well as in the (back) the coining cell (which were the normal operating speeds), the Grievant had the speeds set down to "somewhere around 35, 40 percent."  Favors stated that the Grievant told him "We are going to take our time, we are going to give them only what we have to... we are going to run them slow."  He went on to testify that

---

10/ At about the same time, the Company discharged Ferguson, who worked in heat treat; and suspended for two weeks an employee named Ed Gaddi, who worked on the Hydraulic Press and allegedly ran it at a slow speed.  Pinson said Gaddi had 40 years' seniority and the Company could not prove that he purposely slowed down the speed on the press. Additionally, the Company suspended for two weeks Kevin Rouse for "not having been forthcoming in the investigation", in that he failed to corroborate McGill's testimony as

10

it was a common problem that every time he came back from his break John Plyler and the Grievant would have the robot speeds turned down and Favors would have to go around and reset the speeds. 11/  He said he reported this to Ross Russo who was the third shift Machine Supervisor.  Favors said that he saw the Grievant slow down the robot speeds when he, Favors, was in training under the Grievant.

   2.   *Jerry Bruno-* was the second Shift Supervisor.  He testified that on July 9 he was walking by Machine Line No. 7, which the Grievant was working on and he noticed that the Okuma cell was set at 50 percent, the Chiron cell at 35 percent and the coining cell at 45 percent, all slower than the standard speeds at which they should have been running. 12/  He approached the Grievant and asked him if there were any maintenance issues and he said "everything was running great."  Bruno then asked why was he then running the robots so slow and the Grievant replied that "Well, I can turn the robot speeds up to a hundred percent."  Bruno told him that was not a good idea as it would be unsafe, and that he should turn the speeds back to the normal speeds.  The Grievant then turned the robot speeds back to normal. Bruno testified that at the beginning of the shift the robot speeds

---

expected.
11/ There is no evidence that Plyler was disciplined for being involved in setting the robot speeds back as testified to by Favors.
12/ Bruno stated that the robot speeds were posted at the time.

were properly set at 65 percent, 45 percent, and 45 percent. Bruno then documented the incident and forwarded it onto Pinson.

Bruno testified to an incident in June when the Grievant after a short shutdown turned the Okuma cell on into a manual operation, to warm the spindles up. Since the shutdown of the equipment was so short it was not necessary as usually was for a long shutdown, to start the equipment up slow by putting it on manual control. The Company attempted to cite a 20-minute delay as evidence of the Grievant slowing down production. Frankly, the testimony of Bruno and Shindledecker on this issue was very tenuous, and I do not give it much weight.

3.   *David Shindledecker*- at the time of the hearing was employed elsewhere and was subpoenaed. At the time the Grievant was discharged, Shindledecker was the first shift Machine Line Supervisor. I found him to be a very credible witness who, by virtue of his no longer being employed by the Company, had no reason not to be credible. According to Shindledecker the robot speeds when things are running okay are to be set at 65 percent, 45 percent and 45 percent. These speeds had been established before he started.13/ He said there was no reason to run the first cell at say 55 percent rather than 65 percent if there was no problem. He said that the speeds were not posted anywhere.

---

13/ Employer's Exhibit No. 1 shows these speeds. Shindledecker confirmed that those were the speeds that the robots were to be run at and the speeds he told his crew to run the robots at. There was no evidence as to when EX-1 was prepared, and I am led to believe that the document was prepared for the

He testified that on May 25 there were a number of "crashes" on the machine line that the Grievant was on at the beginning of the shift.14/  He said that he pulled up a report on the crashes and saw that there were 12 or 15 of what he considered to be "strange offset adjustments made the previous shift."  Because of how unusual these crashes were, which were quite suspect, Shindledecker informed Pinson of the event, but did not question the Grievant about the incident. 15/

Shindledecker, referring to the June incident of the Grievant delaying the start up of the equipment after a short shutdown, explained that for such a short shutdown, he did not have to delay the start up of the equipment. 16/

4.  *Ross Russo-* was the Company's fourth witness.  Like Shindledecker, he no longer worked for the Company.  At the time the Grievant was discharged, Russo was a third shift Line Supervisor. 17/  He stated that the operators on the line set the

---

hearing and did not exist prior to then.
14/ As noted *infra*, there were two machines in operation at the time with two operators on each machine and a Machine Operator called the "Tag Man" who helped out on both machines and relieved the other four operators for their breaks.  The testimony indicated they rotated "regularly."  There was no evidence as to the amount of time between rotations.
15/ Why the Grievant was made the target of the suspicion was not made clear, since there were five Machine Operators on the two machine lines that were running at the time and they rotated positions "regularly."
16/ The evidence was not very convincing that this was a deliberate slow down on the Grievant's part.  There was evidence that after a machine shutdown, usually of longer duration, the operator is not to bring the equipment back on line right away, but gradually in order to warm up the bearings.  There was no showing that through training or experience that the Grievant should have known this.
17/ The Union in its Post Hearing Brief argued that the supervisors were nothing but "figureheads" and not qualified machinist.  Whether such characterizations of the "supervisors" were warranted is irrelevant.  Unlike Shindledecker who I believed to be very credible, Russo seemed to me to be

robot speeds. The standard robot speeds had been set by
Shindledecker. He said that because there were a lot of
breakdowns on the third shift, the shift the Grievant worked on,
he was hired.

5.    *William McGill*- was a current hourly employee called
by the Company as their fifth witness. 18/ He said production
was generally lower on the Grievant's line. 19/ He said that it
appeared at times that the machine line on the Grievant's machine
ran slower than others. He said that the Grievant had a "bad
attitude towards the Company", and that he would come in a say
"Fuck the company." The Grievant purportedly gave McGill a hard
time about his signing up to do overtime, saying that he was
stealing it from senior employees that he was bumping them off
the schedule and not allowing them the chance at their weekends.

He went on to say that the robot speeds of 65, 45 and 45
percents were written several times on the equipment, but would
get erased. McGill said that he did not see the Grievant reduce
the robot speed or talk about reducing the robot speed. He went

---

evasive and not very credible.
18/ McGill, who was not subpoenaed, complained about his being forced to talk
to the Company during the investigation of the Grievant's alleged slow down.
He said he was told that his job was on the line if he didn't go in and talk
to Mr. Pinson during the investigation. At the beginning of his testimony he
said that he thought he was going to have a chance to talk to the Union's
lawyer before he testified. He requested a break so he could talk to the
Union's representative, Louis C. Stagner. The hearing was halted so that he
could confer with the Union representative, which he did for five or ten
minutes before resuming his testimony. Although he was very uncomfortable
testifying, I believe he was a credible witness.

19/ There apparently are no production records kept that shows the amount of
production coming off each line by shift.

on to say "I never saw any slowdown... or anything like that." However, he did testify that John Plyler, a co-worker would turn out 150 wheels on a regular basis, while the Grievant would only turn out 120.

6.    *Michael Pinson*- the Company's Human Resource Manager was the Company's sixth witness.  His testimony is set forth in Part II B above.

7.    *David Jude*- now a Production Supervisor, was a Machine Line Supervisor in July 2004.  He testified that the robot speeds on the machine line are supposed to be 65, 45, 45 percents.  He said that the speeds were written on the control panels and the servo control panels.  According to Jude those speeds were written there ever since the Company employed him.

He went on to testify that in June of 2004 he was present for a meeting that took place between Pinson and McGill at a local MacDonald's.  He said McGill initiated the meeting.  Jude said that McGill had mentioned something to Bruno.  Bruno apparently did not keep it to himself and McGill was very upset.  As a result he did not trust Bruno.  Jude told McGill if he did not want to tell the Company on the premises he could tell them off the premises.  McGill responded by allegedly saying "Yeah, let's [d]o it off site", and he then asked Jude to be there.  He stated that McGill's job was not threatened during the McDonald

15

meeting as suggested by the Union.  Jude said that McGill told the two of them that he saw the Grievant lower the robot speeds.


### D. The Union Witnesses-

1.  *Frederic Petrusch*- a Union representative, was the Union's first witness.  He testified that he attended a meeting held on July 20 as a representative of the Grievant, while the Grievant was on suspension.  At that meeting Pinson accused the Grievant of a slow down.  He said no proof was presented as to the Grievant's "alleged wrongdoing." He said he did not say anything at the meeting as he was told by Pinson not to ask questions.  Petrusch said that he attended another meeting on July 22 when the Grievant's suspension was changed to a discharge. 20/

Subsequently, Petrusch said that he requested information from the Company.  He got some production and discipline records, but it was much later that he learned who made the allegations against the Grievant. 21/

---

20 The record seems to be pretty clear that the Grievant was suspended on July 10 effective July 11 (JX-3), that a meeting was held on July 20 to give the Grievant a chance to provide his side of the story (JX-5), and on July 22 a Section 7.2 meeting was held to review the facts (JX-5).
21/ It appears that the Union asked for certain information in connection with the suspension/discharge of the Grievant and the Company refused to divulge information obtained from employees, including the names of those that gave information about the Grievant.  The Company would not disclose the information because they claimed they as well as the employees involved were concerned about their personal safety.  It appears they asked for assurances to protect the employees from any recriminations.  Apparently nothing was

2.  *Gary Montroy*- was the Union's second witness.  At the time of the hearing he was the President of the Local union, though Ferguson appears to have been the President at the time that the Grievant was discharged.  Montroy testified that in March 2004 Sabrina Gore, an employee on the third shift, was upset over the fact that John Plyler was going to bump her out of a job she had allegedly been promised.  She said she wasn't going to do the job to which she had been reassigned and she said she was going home.  Montroy assured her she was right.  Even though she knew Montroy was talking to supervision about the matter and that Montroy told Plyler that he could not move, she said she was going home anyway.  Montroy testified that she went home and for it was given a one day suspension.  However, Union Exhibit 4, a disciplinary letter addressed to Sabrina Gore, seems to contradict Montroy's testimony in that it states in part : "...you were sent home because of your abusive response to your supervisor's directive to return to your assigned work station." The disciplinary letter goes on to say: " The shift that you missed on or about March 13 as a result of being sent home by your supervisor will be counted as your one day suspension." 22/

Further, Montroy testified that supervisor Bruno said to him

---

worked out.
22/ It appears that Ms. Gore was accused of violating Rules 1 and 5 of the Company's Rules of Conduct (JX-2).  The Grievant on the other hand was charged with violating Rule 11 which prohibits "any attempt to interrupt production or any aspect of the operations; or unsatisfactory and/or insufficient work."

that night that he was going to shut down number 7 line "and she is going home."

Montroy went on to testify that Kevin Rouse was suspended for 14 days for not cooperating in an investigation the Company was conducting with respect to the suspected slowdown. Initially the suspension was without pay, but after a grievance was filed the Company agreed prior to arbitration to pay him.

Montroy said that the Union asked the Company for information with regards to the suspension and termination of the Grievant. At first that information was not forthcoming, apparently out of concern that there might be retaliation against the Company witnesses. He said that the Company said it was fearful that union members were going to intimidate or harass the employees who had talked to the Company. He said subsequently he was given the names of witnesses, but the union did not interview those witnesses out of fear that he would be accused of participating in the slow down or of trying to intimidate them.

3.  _Gregory Goodwin_- the Grievant, was the Union's third witness. He testified that when Shindledecker took over the department he, the Grievant, was given a booklet entitled "Turning Cell Start Up (cold)", "Chiron Cell Start Up (cold)", and "Coining and Wash Cell"(UX-2). That booklet has seven pages devoted to the operation of the machine line. The Union pointed out that nowhere in that booklet does it indicate machine line

18

speeds (or robot speeds), but only spindle speeds. The Grievant took issue with 65,45, 45 being the standard speed at which the robots were to be set. He said that the robots "were slowed down, or sped up, depending on condition of the quality of the wheels, for what was happening at the time." He indicated some of the production problems that might be experienced that would require that the robot speeds be slowed down. For example if the robot would leave a nick on a wheel or cause other quality problem the robot speed would be slowed down.

He said that Pinson accused him of a work stoppage slow down at the discharge meeting that took place on July 22. He said that he told the Company at that meeting that he knew nothing about any slowdown. He also said that he did not know of "any purported slow down by the union." He denied ever saying, "Fuck the company." On the day that Bruno claimed that the Grievant was running at too slow of a speed, there was 19 scrap wheels that day, for no fills. He explained that when you have non-fills, and they go into the Chirons they will shut the Chiron down completely. He went on to say that "we had problems with the robots going through the Chiron doors all by themselves, take the doors completely out." He said that by slowing down a little bit, it took care of that problem. He denied that Bruno asked him that day how production was going. 23/

---

23/ I credit Bruno's testimony on this point. I believe Bruno did ask the Grievant how production was going and that the Grievant said "everything was

The Grievant said he kept track of his production and that he averaged 141 to 144 wheels, which was basically the same as what other employees were producing.

As to starting up slowly after the machine line was shut down, he said that he was warming up the spindles. The bearings were virgin, only a week old. He said that they still had virgin oil in them, and that Shindledecker came in early and warmed up the spindles. Shindledecker said to the Grievant "We are bringing them up to temp." He said that he was warming up the spindles for seven minutes when Bruno got "all over" his back telling him to "start them up."

The Grievant denied telling Favors that he was running the machine line slower because he didn't want to give the Company any more work than he absolutely had to give. As to slowing the robot speeds down when he was tag relief for Favors, he said that he would slow the equipment down if something happened and he had to go inside the cell to fix it. However, he could not recall such an incident occurring while Favors was an operator.

4.    *John Plyler*- was the union's fourth witness. Plyler until eight months ago worked for Accuride. He testified that he was not aware of any concerted activities that included a plan to slow down. He said that he was aware of Sabrina Gore having a "hissy fit," telling the boss to go "F" himself and walking out the door. He was not aware of any discipline that was levied

running great."

against her.  He went on to say that he was aware of two
employees who slept on the job, and although supervision was
aware of their sleeping, they were not disciplined- Sabrina Gore
and Aubrey Favors. 24/ According to Plyler, supervision was
scared of Ms. Gore because "she always made a hissy fit, and
always said she was going to call the NAACP...to try to get her
own way."  In both cases he claimed that supervision observed
both of them sleeping, although he did not know if either of them
were disciplined for sleeping on the job.  As to the credibility
of the Company's witness McGill, he said, Russo once told him
that McGill "talks out of both sides of his mouth, that they
didn't believe what he said more or less."

    5.  *Scott Jones*- the Union's fifth witness was a Machine
Line Operator in June-July of 2004.  He testified that he was not
told the speed that the robots should be set at other than 65
percent when running the Monaco Coach wheel. 25/  He said that
the Grievant cared about the job.  He gave as an example where
the Grievant pointed out to him that his machine was running slow
where Jones unwittingly was running his machine slow.

    6.  *Kevin Rouse*- an employee in the spin/heat treat
department, was the Union's sixth witness.  He stated that during
the investigation into the Grievant's alleged slowdown, he,

---

24/ Ms. Gore and Mr. Favors are both Afro-Americans, everyone else connected
with this case is white.
25/ Based on the overwhelming testimony by others on this issue, I donot
credit Jones's testimony on this issue.

Rouse, was escorted into the Human Resource office where Pinson questioned him. Rouse said the questioning was very harassing and intimidating. According to Rouse, Pinson said he didn't believe him. Rouse said that he told Pinson that he was unaware of any slowdown, and Pinson got angry. Rouse said that Pinson implied that he was lying and withholding information.

Rouse said that a supervisor told him that a conversation was allegedly overheard where the Grievant told Rouse to perform a work slow down. However, Rouse unequivocally denied that the Grievant ever told him or anyone to slow down. Nonetheless, he said that he was also charged with engaging in a slow down. Rouse was suspended pending investigation for his allegedly being involved in a slow down in violation of Article 42, the no-strike clause. He said that after a grievance was filed he was paid back pay for the time he was off.

III- Relevant Contractual Provisions

And Rules of Conduct

ARTICLE 1

PURPOSE AND SCOPE

***

1.3 Direction of the Workforce

Except as may be limited by the provisions of this Agreement, the operation

22

of the Plant and the direction of the work force, including the right to...<u>suspend, dismiss, and discharge any employee for just cause</u>...are exclusively vested with the Company.

***

ARTICLE 4
PROHIBITION OF DISCRIMINATION

Neither the Company nor the Union will discriminate against an employee because of the employee's race, color,...sex,...or membership or nonmembership (sic) in the Union. ...

ARTICLE 7

DISCIPLINARY ACTION AND DISCHARGE

7.1

The right of the Company to establish regulations for the orderly control of the plant operations and to discipline or discharge employees for just cause is recognized. For the Company to effectively do so, the establishment of the plant rules of conduct...are necessary. Such rules and regulations shall not be in violation of any provisions of this Agreement.

7.2 Discharge Procedure

No employee shall be peremptorily discharged, but shall first be suspended pending investigation. If the Company makes a preliminary determination that the employee should be discharged, and if the employee requests a hearing to review the facts, the Company will schedule a hearing for that purpose. A union representative will be present at the hearing.... The Company will make a final determination within 14 calendar days of the date the employee was suspended... A grievance concerning a discharge may be submitted at Step 3 of the

23

grievance procedure within seven calendar
days of the date of the discharge. If the
Company determines that no discipline is
warranted, the employee will be reinstated
with back pay.

ARTICLE 42
STRIKES AND LOCKOUTS

42.1

During this Agreement and any extension
thereof, the Union will not authorize or
knowingly permit employees to cause or take
part in any strikes, work stoppages,
slowdowns, or interruptions or cessations of
work, and the Company will not lock out
employees.

42.2

Any employees who engage in the actions
prohibited by Article 42.1 are subject to
discipline and discharge.

(Emphasis supplied) (JX-1)


RULES OF CONDUCT

In order for the Erie Plant to operate
smoothly and efficiently, all employees are
expected to observe essential common sense
rules of conduct based on honesty and common
decency. Employees who violate these widely
accepted industrial Rules of Conduct subject
themselves to discipline, including
discharge, depending upon the circumstances.
Some of the actions that cannot be condoned
and that may result in disciplinary action
include the following:

1. Insubordination, including
   failure to perform assigned work
   or failure to follow directions
   or instructions.

***

24

5.  Sleeping or loafing while on
    duty, or absence from your
    assigned job or work area without
    permission.

                    ***

11. ... [A]<u>ny attempt to interrupt
    production or</u> any aspect of the
    operations, or unsatisfactory
    and/or <u>insufficient work</u>.

(Emphasis supplied) (JX-2)


                IV- Discussion

A. <u>Did the Grievant Engage in a Slow Down in Violation of the No-
   strike Clause?</u>


    One could frame the question in this case as "when is a

slowdown not a slowdown." Stated differently does the individual

effort of one employee to work at a slow pace without any known

labor objective constitute a slowdown prohibited by Article 42

(the no strike clause) of the collective bargaining agreement.

The answer to that question seems to be quite clear NO.

Nonetheless, the July 23 Notice of Termination (JX-5) to the

Grievant said "Your conduct violated Article 42 of the Agreement

and Rule 11 of the Rules of Conduct." However, the Company in

its opening statement at the hearing said, "This case isn't about

enforcement of the no-strike clause, with respect to a slow

down." When I questioned Company counsel to make sure I was

                        25

hearing right, he reaffirmed his statement. (TR 15).  Later in

the hearing, the following colloquy took place:

> Arbitrator: Whether he was involved in a
> concerted activity, or not, with others, you
> are not contending, and you are not hanging
> your hat on that, you are hanging your hat on
> his individual efforts.

> Mr. Miner: Correct.  We are not going to try
> to prove other employees' misconduct in other
> areas of the plant.

(TR 185-86).


     However, the Company in its Post Hearing Brief reverted to

the position that the Grievant's conduct did constitute a

slowdown in violation of Article 42.  (See Company's Post Hearing

Brief, 18, 21). It seems to me once the Company in unequivocal

words made it clear at the hearing that it no longer was

attempting to enforce Article 42, it cannot in all fairness to

the Union, reverse course and claim in the Post Hearing Brief

that the conduct did violate Article 42. 26/  Further, the term

---

26/ To understand this apparent waffling it is necessary to be aware of events
that took place in the plant in the late spring and early summer of 2004.
Because production was off considerably in May and June, and because of
information that Favors gave to Pinson indicating that Doug Ferguson, the then
Local union President, might be attempting a slow down, the Company initiated
an investigation in mid-June and early July.  As a result of the
investigation, Ferguson was suspended and then discharged for engaging in a
slow down.  Subsequently the discharge was changed to a retirement.  Ed Gaddi,
an hydraulic press operator was given a two week suspension for running his
press too slow; Kevin Rouse was given a two week suspension for not being
forthcoming in the Company's investigation into the possible slow down, and
the Grievant was discharged.  There was absolutely no evidence that there was
any agreement or understanding of any kind between Ferguson, Gaddi or the
Grievant or that there was any labor objective that any of them might have
been trying to obtain.

slowdown as used in Article 42 clearly does not cover the Grievant's conduct. Slowdown is defined in <u>Black's Law Dictionary</u>, 1422 (8th Ed. Thomson-West) (2004) as "An organized effort by workers to decrease production to pressure the employer to take some action." In a case on point, Arbitrator Benjamin Shieber said in <u>Walgreen Company</u>, 100 Lab. Arb. (BNA) 468, 470 (1992) the language in the no-strike clause made "it clear that poor work performance by an individual employee, even if that poor work performance were the result of an <u>intentional slowdown</u> of work by that employee, would not fall within its provisions." (emphasis supplied). <u>27</u>/ Similarly, in <u>Pantry Pride Enterprises, Inc.</u>, 79 Lab. Arb.(BNA) 883, 887-88 (1982), Arbitrator R. G. Carson, Jr. held that the employer failed to establish that a discharged employee engaged in a slowdown in violation of a no-strike clause because it was not a group effort for a common cause. See also, <u>WTRF-TV</u>, 119 Lab. Arb.(BNA) 92 (2003) where Arbitrator Matthew Franckiewcz ruled that for conduct to be covered by a no strike clause it must be "joint action" for the purpose of applying "economic pressure to Management to accede to the employees' demands." Id. at 95-96. In <u>Fort Wayne Foundry</u>, 103 Lab. Arb. (BNA) 940, 943 (1994), arbitrator Michael Paolucci held four employees who left work early did not engage in a

---

27/ "[A]ctivity by a single employee for that individual's own personal benefit is not concerted activity." P. Hardin, <u>The Developing Labor Law</u>, 79, 79 fn. 13 (4th Ed. BNA Books) (2001).

concerted work stoppage in violation of the no strike clause because there was not a "common goal."

The cases cited by the Company in its Post Hearing Brief do not comport with the industrial understanding of what a slowdown is that is prohibited by a no-strike clause. <u>Vernitron Piezoelectric Division</u>, 84 Lab. Arb. (BNA) 1315 (1985) is inapposite because the discharged employee, unlike the instant case, held a position in the union, i.e. "senior Union steward", and he attempted to impede work of probationary employees. In the instant case there was no evidence that the Grievant held any position in the Union. <u>Lancaster Electro Plating Inc.</u>, 93 Lab. Arb (BNA) 203 (Robert Bressler, Arb)(1989) dealt with insubordination and not a slow down. In that case the discharged employee, a union steward, refused a direct order of his supervisor. In <u>Dietrich Industries, Inc.</u>, 113 Lab. Arb. (BNA) 905 (Marvin Feldman, Arb.)(1999) the discharged employee who was president of the local union attempted to have employees engage in a slow down because of the "way the company was handling some issues." Cf.<u>Hoover Group, Inc.</u>, 97 Lab. Arb. (BNA) 1006 (Stanford Madden, Arb)(1991) (which involved a slowdown not controlled by a no-strike clause).

<u>B. Was the Grievant's Conduct in Violation of Rule 11?</u>

Rule 11 states in part " ...any attempt to interrupt production or any aspect of the operations; or unsatisfactory

28

and/or insufficient work." The preponderance of the credible evidence supports the proposition that the Grievant's conduct did violate Rule 11. The Grievant regularly said "fuck the company" and he on a number of occasions, including July 9[th], set the robot speeds on his machine line at less than the established standard of 65, 45, 45 percents. 28/ The testimony that the Grievant on May 25th may have made "strange adjustments" on his machine that led to production difficulties was too tenuous to fault him. There were two lines running at the time with five Operators on the two lines that regularly rotated. There was no explanation as to why Schindledecker attributed this to the Grievant rather than one of the other four Operators.

The testimony that on June 12 he delayed starting up the line some 20 minutes after it was down for some maintenance work, also was quite tenuous. The Grievant stated that the practice was that after the line is down for a while, the equipment could not be started right up, but had to be started up slowly. Other testimony made it clear that he was wrong in this regard, but he did bring the line up to the standard speed when told to do so by his supervisor. Although, I think the Grievant knew this, the evidence was quite weak in trying to show that he deliberately delayed starting up the equipment. Since the Company has the

---

28/  The Union in its presentation attempted to show that the 65-45-45 standard was not generally known and was not posted. However, considering all of the testimony on this subject it appears clear that the 65-45-45 standard was known by all operators even though a posting of these speeds was not

burden of proof in a discharge case, I find that it did not meet
that burden with respect to the delayed start up on June 12.

## C. Disparate Treatment

The Union claims that there is a disparity of treatment
between the Grievant's conduct and that of a co-employee, Sabrina
Gore. On March 24th, Ms. Gore was given a one day disciplinary
suspension for leaving her work area and abusive her supervisor
an abusive response when directed by him to return to her work
area. Her supervisor sent her home and the time was counted as
the one day off without pay (UX-4). The Union claims that she
only received one day for violating the same rule that the
Grievant is charged with violating, i.e. Rule 11. Although the
Grievant was charged specifically with violating Rule 11, Ms.
Gore's disciplinary notice fails to designate by number which
rule or rules she violated. Reviewing the disciplinary notice,
it appears that she was charged with violating Rules number 1 and
5. The Union claims that she left the plant on the night in
question and only received one day off. However, the evidence is
pretty clear that Ms. Gore did not go home on her own, but was
sent home by her supervisor, Jerry Bruno. See Union Exhibit 4
and the testimony of Gary Montroy, the current Local Union
President who said that Bruno said to him that night he was going
to shut her machine line down "and she is going home" (TR. 226).

always on display.

30

As the rule violations and the conduct involved are quite
different, I cannot conclude there was disparate treatment.

### E. Did the Company Conduct a Fair and Thorough Investigation?

The Union contends that the investigation was perfunctory,
not a fair, proper or objective. Nowhere in the Agreement is
there any requirement that a disciplinary investigation must be
"fair, proper or objective." The only reference to a
disciplinary investigation in the Agreement is in Article 7,
Section 7.1 that states, "No employee shall be peremptorily
discharged, but shall first be suspended pending investigation."
The Company is only obligated to do an investigation. If it is
not fair, proper and objective, the Company, of course, runs a
great risk of the discharge being overturned because it will not
be able to prove that it was for "just cause." In the instant
case, I believe the Company did continue its investigation of the
Grievant's conduct after he was suspended on July 10. Although
one could arguably second guess the Company for not obtaining
signed statements from witnesses or failing to produce evidence
as to what the Grievant said in his defense when questioned by
the Company about the slow down, I do not believe such
shortcomings are grounds for overturning the discipline. I am of
the view that under the circumstances, the Company's
investigation was thorough and fair.

31

## F. Weingarten Rights

Frederic Petrusch testified that he attended, as a union representative, a meeting Pinson had with the Grievant on July 20th. At that meeting, Petrusch said that Pinson told him he could not ask any questions. The Union in its Post Hearing Brief referred to that incident as part of its argument that the Company's investigation was flawed. Under the National Labor Relations Act, the Union is correct. Under the Supreme Court's holding in NLRB v. J. Weingarten, Inc., 420 U.S. 251 (1975), and its progeny, a union representative must be accorded an opportunity to speak as the rule contemplates meaningful representation. See Barnard College, 340 NLRB No. 106 (2003); Southwestern Bell Tel. Co., 251 NLRB 612 (1980) *enf. denied* 667 F 2d 470 (5th Cir 1982). However, the Board holds that a make whole remedy is not an appropriate remedy if the employee's discharge is nonetheless for just cause. Taracorp Industries, 273 NLRB 221 (1984). See P. Hardin, The Developing Labor Law, 199 (4th Ed. 2001). Arbitrators are divided on whether they should consider the Weingarten line of cases or not. Since Section 7.2 of the Agreement requires that a Union representative be present at a Section 7.2 hearing, I am obligated to consider whether the Grievant's Weingarten rights were protected. Arbitrators have held that a violation of an employee's Weingarten rights is grounds for setting discipline

32

aside only if there is a showing of prejudice. See N. Brand,
Discipline and Discharge in Arbitration, 52-53, 53 n. 165 (BNA
Books, 1998). There is no claim nor evidence that the grievant
was prejudiced in any way by the Union Representative not being
permitted to ask questions.

G.  Alleged Failure to Provide Timely Information and Notes

    The Union argues that the Company failed to provide
requested information without a long delay and failed to
provide its notes from the investigation. 29/ As to the
allegation that the Company did not provide some of the
requested information in a timely manner, the Company responds
that it had legitimate concerns for the safety of hourly
employees who talked with the Company, namely Favors and
McGill. McGill was not willing to meet with Pinson at the
plant and requested that they meet instead at a local
McDonald's restaurant because of his concern for his own
safety and the safety of his family. Because of this the
Company would not give information to the Union until it had
from the Union specific steps they were prepared to take to
prevent harassment and retaliation against those witnesses
after their identities were disclosed. Apparently the Union

---

29/ The Union also argues that the Company failed to "review the facts" at the
July 22 meeting as required by Section 7.2 of the Agreement. I find that the
Company did review the facts at that meeting based on the content of Joint
Exhibit 5, Notice of Termination. Even if it didn't, the oversight was cured

33

made no suggestions on how that might be accomplished. (See letter to the Union dated August 3, 2004, JX-10).

Knowing what was going on at the time, i.e. the President of the Local being discharged for engaging in a slowdown, Gaddi being suspended for two weeks for running his press too slow, and Rouse being given a two week suspension for not being forthcoming in the investigation, it is understandable that the Company would have a concern for the security of bargaining unit witnesses. McGill expressed that concern when he asked to meet off of the Company property at a local Mc Donald's. The Company did offer to make the names of the employee witnesses available if the Union would agree to sign a Joint Statement it proposed. The Company made it clear that it invited from the Union other ideas it might have "regarding what steps the Union [was] prepared to take to prevent harassment and retaliation of investigation witnesses."

The Company's right to withhold the identity of employee witnesses has been upheld when there is a legitimate concern for their security and the Company has attempted to obtain from the union appropriate safeguards. *See* Metropolitan Edison Company, 330 NLRB 107 (1999) (employer violated Section 8(a)(5) of the National Labor Relations Act by its blanket refusal to provide the union with names of informants who

---

the next day when the detailed explanation for the discharge was provided in the Notice of Termination.

provided information related to workplace theft); <u>U.S. Testing</u>

<u>Co. v. NLRB,</u> 160 F3d 14, 20-21 (D.C. Cir. 1998); New Jersey

<u>Bell Telephone Co.</u>, 300 NLRB 42 (1990), *enf'd* 936 F2d 144 (3d

Cir. 1991); <u>Anheuser-Busch, Inc.</u>, 237 NLRB 982 (1978).  In the

instant case, the Company, unlike the Company in the

<u>Metropolitan</u> case, did come forward with an offer on

accommodating both its concern for the security of its

employee witnesses and the Union's legitimate needs for

relevant information.  The Union failed to make any proposal

on how the employee witnesses would be protected if the

Company turned the names over to the Union.  The Company did

not make a "blanket refusal" to provide the information.  In

Elkouri & Elkouri, <u>How Arbitration Works</u>, 425, 425 fn. 445 (6th

Ed. BNA Books) ( 2003), it states "where witnesses fear

possible intimidation by the grievant or his supporters, an

arbitrator was held not to have violated the Federal

Arbitration Act by keeping their identity secret until they

testified, citing to <u>Cemetery Workers and Greens Attendant</u>

<u>Local 365 v. Woodlawn Cemetery</u>, 152 LRRM 2360 (S.D.N.Y. 1995).

In any event, the Company did ultimately disclose to the

Union Favors's and McGill's identity., but the Union elected

not to interview either of them lest they be accused of

participating in the slowdown and intimidating the two

witnesses.  In view of the Company's ultimate disclosure there

35

is no showing that the Union's position was prejudiced by this understandable delay.

H.   What is the Appropriate Remedy?

The parties stipulated the issue to be "Whether there was just cause for the discharge" of the Grievant, "and if not, what is the appropriate remedy." Since the Company dropped its allegation that the Grievant violated Article 42 and I have found that it did not prove the Grievant violated Article 42, I believe the discharge was not for just cause. Nevertheless, the Grievant's conduct, both in repeatedly saying to coworkers "fuck the Company" and his proven slow production calls for serious discipline. Since he was not warned of the consequences of such conduct and since he has a clean disciplinary record, I cannot find that discharge is appropriate. I find the appropriate remedy to be reinstatement with full seniority, but without back pay or any benefits for the time he has been off work, i.e. July 11, 2004 to the date of this award. A disciplinary note should be placed in his personnel file showing that he was given a disciplinary suspension during this period for deliberate slow production in violation of Rule No. 11 and a warning that future unjustified slowdowns may result in his discharge.

V Conclusion and Award

36

The Grievant did not engage in a slowdown prohibited by Article 42 of the Agreement, but did purposely slow equipment down in violation of Rule 11. As a result he should be reinstated with full seniority, but without back pay. A warning should be placed in his personnel file that future unjustified slowdowns may result in his discharge.

Donald T. O'Connor, Esq.
Arbitrator
Naples, Florida

Date: February 11, 2006