# Exhibit K

1

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

- - - -

GREGORY GOODWIN          )
                         )
                         )
                         )
                         )
          Plaintiff,     )
                         )
          -vs-           )          Civil Action
                         )          No. 05-161
ACCURIDE ERIE, LP        )
                         )
                         )
                         )
          Defendant.     )

**CERTIFIED TRANSCRIPT**

- - - -

DEPOSITION OF:  GARY MONTROY

- - - -

DATE:       May 31, 2006
            Wednesday, 9:30 a.m.

LOCATION:   150 East 8th Street
            Erie, PA

TAKEN BY:   Plaintiff
            Gregory Goodwin

REPORTED BY: Cynthia A. Hawley
            Notary Public
            AKF Reference No. CH94797A



6

1  Q.    How long have you been with either Accuride or
2        it's predecessor?
3  A.    33 years.
4  Q.    Was it Keiser?
5  A.    Keiser at one time, yeah.
6  Q.    It was Keiser then it became --
7  A.    AKW.  And then it went to Accuride.
8  Q.    Do you remember about when it became Accuride?
9  A.    About '99 I think.
10 Q.    And you are a member of the union?
11 A.    Yes, sir.
12 Q.    What's your position with the union?
13 A.    I'm the president of the local right now.
14 Q.    And that's UAW?
15 A.    Yes, sir.
16 Q.    What's the local number?
17 A.    Local 1186.
18 Q.    How long have you been the president?
19 A.    About a year.  I was an acting president while
20        our former president was discharged.
21 Q.    And who was the former president?
22 A.    Doug Ferguson.
23 Q.    Doug Ferguson got terminated about when?
24 A.    About the same time that Greg Goodwin did in
25        July of 2004 I think it was.

9

1      might be?

2  A.   Yes.

3  Q.   What are some of the variables, the factors

4      contributing to production during a particular

5      shift?

6  A.   Well, it depends.  If you are, like I can just

7      give you an example where I work.  I'm not real

8      familiar with where Greg worked.  But where I

9      work there's a die temperature, lube factors,

10     stock temperatures.  There's a, it's all

11     variable on a daily basis.

12              So say, for instance, you are running

13     out of one furnace you might empty the furnace

14     and the stock gets cold.  So that is a

15     variable.  There's a different number of

16     variables in determining the product coming out

17     for the day.  Also, there's a variable in how

18     the equipment's running.  The equipment might

19     not be up to par and you might have problems

20     all day.

21 Q.   Or you might have to shut it down?

22 A.   Exactly.

23 Q.   Now, in terms of the union, your union duties,

24     you are the vice president.  How long had you

25     been the vice president as of 2004?

1  A.    About a year.

2  Q.    And before the vice president what were you?

3  A.    Committee person for about, I think it was

4        about five years I was a committee person.  I

5        was a steward prior to that.

6  Q.    That was my question.  Really going to the

7        question of how long have you had a role

8        through the union in grievances?

9  A.    Probably 20 years.

10  Q.    All right.  Now, is it your expectation as a

11        union official that the company impose

12        discipline on an even basis?

13  A.    That's my anticipation, yes, sir.

14  Q.    In other words, they don't favor one person

15        over another?

16  A.    Right.

17  Q.    If one person commits a certain kind of an

18        infraction and another person commits that same

19        kind of infraction you would expect the

20        discipline to be the same?

21  A.    Exactly.

22  Q.    Or at least comparable?

23  A.    Comparable discipline for comparable

24        happenings.

25  Q.    Is fighting with a coworker considered a

1  A.    Yes.

2  Q.    Actually, in one capacity or the other you've

3        been a union official since she started to work

4        for the company?

5  A.    Yes.

6  Q.    Are you familiar with the fact that she's been

7        disciplined on several occasions?

8  A.    Yes.

9  Q.    I've got some documents.  I'll show you the

10       documents in a second.  Are you familiar with

11       the fact that she was disciplined for

12       disobeying a direct order from her supervisor?

13 A.    Yes.

14 Q.    Do you recall what that direct order was?

15 A.    I believe she was supposed to go to work on the

16       line.  And she said in so many words, go F

17       yourself, I'm going home.

18 Q.    Now, she got disciplined for that, correct?

19 A.    Yes, she did.

20 Q.    But she didn't get terminated?

21 A.    No.

22 Q.    There's another instant.  Do you remember an

23       instant concerning a sign that said White

24       Power?

25 A.    Yes, I'm familiar with it, yes.

1  Q.    What do you know about it?

2  A.    What I know about it is that her and a fellow

3        worker were good friends.  He was white and

4        she's black.  And they played games with each

5        other.  And it had to do with race.  I mean,

6        they called each other names.  It was more like

7        those two people getting along, that's how they

8        got along.

9  Q.    Who was that person?

10 A.    Steve Coughlin.

11 Q.    Steve?

12 A.    Coughlin.

13 Q.    C-o-u-g-h-l-i-n?

14 A.    Yes.

15 Q.    All right.

16 A.    And someone found something that Steve had

17       written on her magazine or something.  I can't

18       remember what it was.  And it was only for her

19       eyes only.  And it was for nobody else.  But

20       someone found it.  And what happened finally

21       was the company found out about it, and they

22       don't tolerate anything racial.  And I think

23       they both got a day off or two days.  I can't

24       remember how much time they got off, but they

25       were both disciplined for it.

1 A.   Yeah.

2 Q.   But they had to shut the other one down?

3 A.   They had to shut it down, yeah.

4 Q.   Help me out here, because there you have

5      Sabrina Gore who disobeys a direct order, goes

6      home, they have to shut down one of the two

7      lines, they lose production, and she doesn't

8      get terminated for that, does she?

9 A.   No.

10 Q.   Now --

11 A.   I'm glad she didn't, I got to tell you, you

12      know.

13 Q.   That's all right.  That's your job.

14 A.   I don't want to see anybody --

15 Q.   Mr. Goodwin got terminated, didn't he?

16 A.   And he shouldn't have either.

17 Q.   I know.  And you testified to that at the

18      hearing, correct?

19 A.   Right.

20 Q.   My question is, if you know, how come you have

21      one person whose disobedience results directly

22      in reduced production is not terminated, you

23      have another person who is simply accused of a

24      slow down, there is no slow down in production

25      and he gets terminated?

1          MR. GOLDNER:  Objection,

2      argumentative, foundation, firsthand knowledge.

3          THE WITNESS:  I don't know.

4  BY MR. CHIVERS:

5  Q.    Other than that -- that was a good answer.  All

6         right.  You don't know?

7  A.    I don't know.

8  Q.    Fine.  Give me two minutes.  I'm going to talk

9         to my client.

10                  - - - -

11     (There was a brief pause in the proceedings.)

12                  - - - -

13                  EXAMINATION

14                  - - - -

15  BY MR. GOLDNER:

16  Q.    Mr. Montroy, I just have a couple questions for

17         you.

18          MR. PINSON:  Can I have 30 seconds

19         for another question?

20          MR. GOLDNER:  Sure.

21  BY MR. GOLDNER:

22  Q.    Mr. Montroy, I believe you testified earlier

23         about production reports or information the

24         company may have that would indicate the

25         production of the various lines.  Do you recall

1 COMMONWEALTH OF PENNSYLVANIA )        CERTIFICATE

2 COUNTY OF ERIE                )        SS:

3    I, Cynthia A. Hawley, a Court Reporter and

4 Notary Public in and for the Commonwealth of

5 Pennsylvania, do hereby certify that the witness,

6 GARY MONTROY, was by me first duly sworn to testify

7 to the truth, the whole truth, and nothing but the

8 truth; that the foregoing deposition was taken at the

9 time and place stated herein; and that the said

10 deposition was recorded stenographically by me and

11 then reduced to printing under my direction, and

12 constitutes a true record of the testimony given by

13 said witness.

14    I further certify that the inspection, reading

15 and signing of said deposition were waived by counsel

16 for the respective parties and by the witness.

17    I further certify that I am not a relative or

18 employee of any of the parties, or a relative or

19 employee of either counsel, and that I am in no way

20 interested directly or indirectly in this action.

21    IN WITNESS WHEREOF, I have hereunto set my hand

22 and affixed my seal of office this 2nd day of June,

23 2006.

24                    *Cynthia A. Hawley*

25                        Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Cynthia A. Hawley, Notary Public
City Of Erie, Erie County
Pittsburgh, Commission Expires Sep 30 2009
412-261-2820
Member, Pennsylvania Association of Notaries

Erie, PA
814-453-5700